IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

    Plaintiff,                    CASE NO. 23-60005-CR-SMITH

vs.

STANTON WITHERSPOON,

    Defendants.
_____/

## SENTENCING MEMORANDUM AND INCORPORATED MOTION FOR DOWNWARD VARIANCE BELOW THE APPLICABLE GUIDELINE RANGE

**COMES NOW** the Defendant, STANTON WITHERSPOON, by and through his undersigned counsel, respectfully submits this sentencing memorandum in support of his request for a sentence below the applicable guideline range that is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §3553(a). Additional co-conspirators are scheduled to be sentenced prior to Mr. Witherspoon. Their sentences may impact undersigned's counsel's argument pursuant to 18 U.S.C. 3553(a)(6). Undersigned counsel will make a specific sentencing recommendation at the time of sentencing. In support of his request the Defendant states as follows:

## I. INTRODUCTION

On August 24, 2023, Stanton Witherspoon pled guilty pursuant to a written plea agreement to Count I of the indictment, which charged him with one count of conspiracy to commit wire fraud.[1]

On October 24, 2023, undersigned counsel filed objections to the Presentence Investigation Report (PSR). Undersigned counsel objected to the four-level role assessment applied by Probation as it is inconsistent with the two-level enhancement contemplated by the signed plea agreement. Undersigned counsel also requested this honorable Court to apply the two-level downward adjustment pursuant to U.S.S.G. § 4C1.1. If this honorable Court sustains undersigned counsel's objection and applies U.S.S.G. § 4C1.1, Mr. Witherspoon's adjusted offense level is a level 22, with a criminal history category I and a corresponding guideline range of 41-51 months.

## II. FACTS SURROUNDING THE INSTANT OFFENSE

a) The Beginning of the Conspiracy

From March 2008 to May 2009, Mr. Witherspoon attended the Southern New Jersey Technical Institute, where he completed the practical nursing program to become a licensed practical nurse (LPN). Mr. Witherspoon's ultimate goal was to become a registered nurse (RN). With that in mind, in February 2014, he enrolled at the Jersey College School of Nursing ("JCSN") and took courses to become an RN. Mr. Witherspoon graduated fourth in his class.

At the time of graduation, JCSN told him that for JCSN to register him for the NCLEX exam (National Council Licensure Examination), he would need to pass JCSN's "exit" exam with a score of 70% or higher. Nine students in his class, including Stanton, scored between 70-75%, and one student scored above 75%. The director of

---

[1] *United States v. Stanton Witherspoon*, Case No. 23-60005-CR-Smith (S.D.F.L. Jan. 1, 2023)DE#74.

2

JCSN then advised the students that JCSN would only register students for the NCLEX exam if they scored 75% or higher. The remaining students were told they would need to pay for three additional months of classes and would need to retake the "exit" exam upon completion of the additional classes. The students were furious and called the local news and their representatives to complain about JCSN's unfair and extortionate practices.

Stanton did not have enough money to pay for additional classes as he had already spent $27,000 towards getting his RN degree. One of Stanton's classmates told him he had enrolled in a school called Metlife in Florida that was much cheaper and would allow him to register for the NCLEX exam. When Stanton called and spoke to a representative of Metlife, she immediately identified Stanton as one of the JCSN students and sympathized with his plight. He was told he could enroll in a 3-6 month "bridge program" and be scheduled to take the NCLEX in as little as three months.

Stanton flew down to Florida and met with the owners and administrators of Metlife. He was very impressed by the program and the people involved and was delighted that his dream of becoming an RN could come to fruition. Metlife then recruited Stanton to find other students who had been put in the same situation as him and offer them the chance to enroll in a program at Metlife. Initially, Stanton believed he was helping other students who, like him, had been unfairly treated. However, as Stanton began to learn the inner workings of the scheme and become more involved, he realized that students were not completing the required number of clinical hours and classes.

Stanton Witherspoon has broken the law. He accepts full responsibility for his actions and understands that he must pay the price. However, Stanton's history and characteristics, his substantial assistance to the government, and his service to his community, support our request for a sentence below the guideline range.

III.     **THE FACTORS IN 18 U.S.C. § 3553 SUPPORT THE DEFENDANT'S MOTION FOR A DOWNWARD VARIANCE**

3

### A. The Court Must Consider All Factors Surrounding the Offense

Pursuant to 18 U.S.C. §3553 and post-*Booker*[2], undersigned counsel asks this court to consider all the factors in Stanton Witherspoon's case when fashioning an appropriate sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.

### B. <u>The Defendant's Substantial Assistance To Authorities</u>

A defendant's assistance to authorities in investigating criminal activities has long been recognized as a mitigating sentencing factor in practice and by statute.[3] Mr. Witherspoon's cooperation is clearly applicable to the "nature and circumstances of the offense and history and characteristics of the Defendant."[4] In *United States v. Sol*, the Eleventh Circuit considered a defendant's "extraordinary acceptance of responsibility" as part of the 3553 factor analysis.[5] The court found that the defendant's guilty plea and her cooperation during her prosecution should be factored into the sentence. Similarly, this court should consider Mr. Witherspoon's early, truthful, and extremely productive cooperation and his absolute and sincere acceptance of responsibility when considering a sentence.

Within two weeks of his arrest, Mr. Witherspoon was fully debriefed and candidly admitted his crime. Stanton was honest and forthright from the beginning of his cooperation. During the first debrief, one of the agents remarked that they had been doing debriefs for twenty years and had never had anyone tell them the truth during the first meeting, but he believed Stanton was being completely truthful. Stanton provided explanatory information, specifics, dates, names, identification of photos, locations, and evidence that has been and will be used to charge unindicted co-conspirators. During the meeting, he also consented to a search of his cell phones and even allowed the agents to download a copy of all files on the phones. His information has undoubtedly assisted the government in future prosecutions.

---

[2] *United States v. Booker*, 543 U.S. 220 (2005),
[3] U.S.C. §5K1.1, comment (backg'd.).
[4] 18 U.S.C. 3553(a)(1).1
[5] *Id*. at 522 Fed. Appx.567, 568 (11th Cir. 2013).

4

Additionally, when Stanton's co-defendants were confronted with the evidence he would have testified to in trial, they readily accepted a plea.

It is anticipated that the government will file a Rule 35 motion for substantial assistance to authorities in his case and the parties will jointly request an extended surrender date to allow Mr. Witherspoon to continue his cooperation. Additional information related to Mr. Witherspoon's cooperation will be provided to this Court at sentencing.

Mr. Witherspoon's actions since the inception of this case exhibit a man who is truly remorseful for his criminal behavior and, as such, warrant a variance below the applicable guideline range. A below guideline sentence would promote respect for the law and provide just punishment for the offense while giving Mr. Witherspoon credit for his truthful, complete, and extremely productive cooperation.

C. **The History and Characteristics of the Defendant Support a Significant Downward Variance Below the Applicable Guideline Sentence**

i. *Stanton's Upbringing During The Civil War In Liberia*

Stanton Witherspoon's life has been scarred by war, famine, and hardship.



He was born in 1975 in Monrovia, Liberia. He lived in the outskirts of Monrovia in Gardnersville until he was ten years old. Stanton lived in a four-bedroom home with his father, mother, grandmother, and nine siblings. The living conditions were cramped and meager, but Stanton's father worked as a lawyer so they could afford food, intermittent electricity, and school.

5

In April 1980, Liberia erupted in violence when President Tolbert was overthrown and murdered in a violent coup.[6] The coup was staged by an indigenous Liberian faction of the Armed Forces of Liberia (ALF) under the command of Master Sergeant Samuel Doe. This rebel faction then sought to persecute those they believed were "Americo-Liberians" instead of native Liberians. With his Anglo-sounding name, Stanton Witherspoon's father and Stanton's family became a target for the rebels. Stanton's father was fired from his job and jailed for months. During his incarceration, he was routinely beaten and humiliated. Stanton's mother was left alone with nine children to care for. She sold bags of ice, made bread, and sold used clothes to provide food for her children. Stanton, age 5, helped his mother as best he could but remembers being hungry and afraid.

On Christmas Eve 1989 the First Civil War began when the National Patriotic Front of Liberia (NPFL)—led by Charles Taylor —launched an assault on Doe's forces.[7] As the war started, the NPFL rebels entered Stanton's small town of Gardnersville, and he was forced to flee with his family and the little belongings they could carry to a village over a one-day walk away. Stanton fled from village to village for the next fourteen years as the NPFL took over more territories. Between 1989 and 2003, over 150,000 to 250,000 Liberian men, women, and children were killed, and over half the country's population was displaced.[8] All parties to the conflict were responsible for grave crimes, and human rights atrocities, including torture, rape, sexual slavery, summary executions, and forced conscription of child soldiers. [9]

Stanton's eldest brother fled the country, and his second brother was killed during the fighting. Early in the war, the rebels beat Stanton's father so severely that he was permanently blinded and suffered a nervous breakdown. Stanton witnessed his father's beating. At the tender age of ten, Stanton was left as the only son to keep his family safe and fed during the war. Stanton would go out daily on his own, or with

---

[6] Wikipedia, the Free Encyclopedia, Liberian Coup d' Etat', at
https://en.wikipedia.org/wiki/1980_Liberian_coup_d%27%C3%A9tat (6 September 2023)
[7] The Center For Justice And Accountability, *Liberia,* at https://cja.org/where-we-work/liberia/
[8] *Id.*
[9] *Id.*

6

his mother, to search for food and water; all the while, dead bodies lay in the street, bullets ricocheted around him, rockets exploded, and the war raged. Stanton's school was constantly closed or damaged due to the fighting, so he was in his mid-twenties by the time he finally finished high school. On one occasion, Stanton and his friends were gathered outside his home playing together. Stanton's mother called him indoors; as he stepped in the doorway of his home, a rocket exploded where his friends had stood. Five of his friends, aged ten years old, died in front of his eyes.

With the horror of war all around him, Stanton turned to the Church for support and safety. He began carrying a bible and would pray and sing gospel songs to people who had died or were sick and injured. Many of Stanton's friends were conscripted as child soldiers, but the rebels did not force Stanton to join them. They were wary of his bible and prayers, perhaps fearing the wrath of a higher power if they harmed him.

At Church in 1997, he met the love of his life, Lawor, when they were young teenagers. They attended church regularly with their families and prayed together.

There was a brief lull in the violence at the end of 1997, but in 1999 the second civil war commenced. The same rebel group that had persecuted and attacked Stanton's family became the country's leaders.

During this time, Stanton continued to attend the Church, was working on getting his high school diploma, and was employed as a receptionist at the school. Tired of poverty, hunger, and war, Stanton started to speak out against the new regime. Stanton's friends and family were terrified for Stanton's safety. Stanton was regularly harassed and beaten by the rebels. On one occasion they jailed him.

Upon his release from jail, one of Stanton's family friends arranged to have Stanton apply for a position in the team of youths going to the African Youth Summit in Washington, DC, that year. USAID funded the program, and it was a UN Chapter organization. The event's purpose was for Liberian youths to discuss living conditions in Liberia to bring about positive change.

      ii.  <u>Stanton's Arrival To The United States</u>

In 2000, Stanton was selected to be on the team and traveled to Washington. When he arrived in Washington, he stayed with Lawor and her family as they had emigrated to the U.S. a few years prior. Upon completing the program, Stanton applied for asylum in the United States and soon became a citizen.

Once in the U.S., Stanton was determined to make a good life for himself and Lawor. He worked hard to earn enough money to pay for the education he thought would allow him to become an LPN. Sadly, the road led him to meet the individuals that would bring him into the conspiracy he has been charged with and pled guilty to.

### a. *Stanton's Involvement In The Community*



In early 2020, Stanton incorporated Spoon Foundation, a not-for-profit organization program to help people in need and the poor in Liberia. Its mission is to empower local Liberian communities by creating long-lasting positive change. When Spoon Foundation was created, Stanton also hosted a radio called Spoon Talk that was live streamed on Facebook. The show was focused on politics in Liberia.

Stanton used his radio show, community outreach, and his money to fund the Spoon Foundation. When listeners would call into the radio show saying they needed  to buy food or were suffering from an illness, Stanton would encourage his listeners to donate to those individuals. Stanton has over 9000 subscribers on his Spoon Talk show, and Spoon Foundation has 130,000 followers on Facebook.

Through the Spoon Foundation, Stanton and his colleagues arranged for a young boy with a cancerous tumor to receive treatment at Mount Sinai in Boston. Numerous other people also received lifesaving medical treatment in the U.S. and

8

were set up with host families, so they had a place to stay while recovering from treatment.



Spoon Foundation was instrumental in distributing lifesaving food to 173 districts in Liberia during the COVID-19 pandemic.[10] Each district received 100 bags of rice weighing over 50 lbs. each. Stanton bought the rice with his funds and organized and paid for transport and distribution to the districts. Stanton also helped facilitate the distribution of PPE and water stations to encourage people to wash their hands to limit the spread of COVID-19. Spoon Foundation volunteers went out in the community to educate people about COVID-19 and encourage mask-wearing.



On January 19, 2022 a stampede at a Christian worship event in New Kru Town killed 29 people. Stanton flew to Liberia and visited the bereaved families. He donated over $15,000 of his own funds to the families who lost family members or who had been injured. He also visited the healthcare workers at the Redemption Hospital to express his appreciation for their hard work. Stanton and the Spoon Foundation volunteers met with authorities and Senate members to discuss the tragedy and how to avoid another one in the future.



The authorities stated that the lack of ambulances contributed to the death toll and injured. Stanton on behalf of the Spoon Foundation donated funds to purchase an ambulance for the Redemption Hospital.

Despite his horrific experiences of war in Liberia, Stanton never forgot where

---

[10] Additional photographs will be filed in a separate filing.

9

he came from and continues to try to help support his Liberian community.

### b. *Who Stanton Is To The People In His Life*



While living in New Jersey, Stanton has created a new community here. He has been a regular church member in New Jersey for the past twenty-five years. He is considered one of the elders in the church and has held various positions of responsibility. He teaches bible study and actively volunteers at all the church events, including a monthly 'feed the community' event. He has donated a van to the church, which he purchased with his funds. He has also made significant personal donations towards the youth fellowship program at the church.

The instant offense does not accurately reflect the character of Stanton Witherspoon. While the crime to which Mr. Witherspoon has pled is a serious felony, the Court respectfully should take note the sum of a man is not reflected in his weakest and worst moments but rather in the character he has built throughout the entirety of his life.

Mr. Witherspoon enjoys a reputation amongst those who know him as hard-working, generous, and compassionate.[11] He greatly values his family and friends, and they respect and love him. A large number of family and friends have written letters to this court to provide an understanding of the individual who the court will sentence. As Mr. Witherspoon's character letters demonstrate, Stanton has been a law-abiding citizen and led an exemplary life filled with acts of service for his community and those in need of help.

---

[11] Character letters will be filed in a separate filing.

10

George S. W. Patten, Sr., the former Ambassador of the Republic of Liberia to the United States, Canada, and Mexico, has known Mr. Witherspoon since 1990 and says Stanton has "established himself as an individual that ordinary Liberians would look to for support." Reverend Raymond H. Kolison says Stanton has "supported our endeavors to raise a group of young people to be assets to the city and nation at large" and that he is " vital to what we do as a congregation." Pastor Adamu James calls Stanton an "organizer and a builder" who leads  He also leads "one of the arm of the ministry called  (H.E.A.L) Help to Ease Agony for Lives which reaches out to the less privilege, homeless, pregnant women and the drug addicts in Trenton, Camden of New Jersey, and Philadelphia." Ansu O. Dualu a former Non-Commissioned Officer in the United States Marine Corp says "there is not a day that goes by that he  (Stanton) does not regret this decision that put so many people at risk." Lawor's Uncle Augustine V. Koenig says Stanton has "always demonstrated his trustworthiness, integrity, accountability, and honesty" and he believes "as he moves forward, he will emerge the better person l have always known him to be." Stanton is someone who "composes himself in dark times and how generous he is with his time and money to family and those who are in need in our country Liberia" according to Deborah Gormah Greenfield, the pastor's wife. Francien Chenoweth Richardson, PsyD calls Mr. Witherspoon "an asset to Liberia and Liberians in the Diaspora, his church, and community. James Samuel Flomo is regarded in Liberia as one of the best young journalists who has helped shape the country, he worked with Spoon Network for four years before leaving for Europe. Stanton helped him by "providing a scholarship for me to study in Europe, and I am currently attending one of the best Universities in Poland (University of Economics and Human Sciences in Warsaw)."

To his family, Stanton is everything. His wife, Lawor, says Stanton is a "wonderful husband and an amazing father to our children" who teaches the children to "work hard in everything they do and to do the best of their abilities." His daughter Aaliyah talks about how her Dad is a "cheerful giver" and how he showed her how to be a "diligent student" by studying hard to become a nurse. His

11

adopted daughter Allakemenin says her Dad is a "loving family man" who loves spending time with his grandson and would happily watch him while she attended her college classes. His niece Fanfinee Dempster says Stanton used to drive "almost six hours on his day off from work to come and see me on Campus and to ensure that I was well."

Mr. Witherspoon hopes that the court will factor into its decision the thoughts and comments of the people in the community who know him best. Mr. Witherspoon's selfless devotion and deep commitment to his family and community represent his character more than the instant offense.

### D. **The Defendant Has Extraordinary Familial Obligations That Warrant A Sentence Below The Applicable Guidelines**

Although section 5H1.6 of the Guidelines states that "family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the Guidelines," courts have recognized that extraordinary family circumstances can warrant a downward departure. "The United States Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom."[12]



Despite the overwhelming stresses of a federal criminal case, Mr. Witherspoon and his wife have maintained a wonderful and strong marriage. They are proud parents to Aaliyah, age 22, who is a college student, and Stanton Jr. ("Junior"), age 12. When Lawor's sister, Allakernenin, was six months old, Stanton and Lawor adopted her. She is now 23-years old and the mother to a nine-month-old son. Allakernenin and her son live with Stanton and Lawor. Mr. Witherspoon was the primary breadwinner for his family.

---

[12] See *United States v. Chambers*, 885 F.Supp. 12 (D.D.C. 1995).

12



Both Lawor and Stanton split responsibilities for the family home and the children. Stanton is extremely close to his son Junior. He does Junior's homework with him every day and takes him to his basketball games and swimming practice. They also enjoy attending church together, and Junior is especially helpful when Stanton is teaching Sunday School classes to the youngest members of their congregation.

Given their closeness as a family and financial reliance on each other, they will face tremendous emotional and financial hardship if Mr. Witherspoon is given a lengthy sentence. Extended incarceration will cause great upset to the family unit, and the developmental impact this will have on Junior at this young, vulnerable age will be everlasting.



The majority of children of incarcerated parents face profound and complex threats to their emotional, physical, educational, and financial well-being.[13] Many children whose parents are involved in the criminal justice system, in particular, face a host of challenges and difficulties: psychological strain, antisocial behavior, suspension or expulsion from school, economic hardship, and criminal activity.[14] Incarceration of one parent also puts the remaining parent under immense pressure to manage the financial, household, and childcare duties which in turn can result in a breakdown in the relationship between the parents. Numerous studies suggest that those incarcerated parents had a much harder time marrying, staying married, and parenting their children.[15]

---

[13] See Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children* NAT'L INST. OF JUST (Mar. 1, 2017), https://www.nij.gov/journals/278/pages/impact-of-incarceration-on-dependent-children.aspx.
[14] See Id.
[15] See Joseph E. Kennedy, *The Jena Six, Mass Incarceration, Remoralization of Civil Rights,* 44 HARV. C.R.-C.L. L. REV. 477 (2009).

Additionally, the sad truth is that as a black man, Mr. Witherspoon and his family will face more negative future consequences with respect to employment, financial security, family stability, impact on his children's development, and reintegration into society than experienced by his white counterparts facing similar charges.



Virtually all research on employment and earnings reflects that people who have been incarcerated and convicted do very poorly in the labor market because of their difficulty in being employed. Nowadays, someone's criminal history is available to all potential employers at the click of a button. More and more states and private employers are instituting rules to exclude individuals with criminal records permanently. In addition, extended periods of absence from the labor market can erode skills and create significant gaps in work histories, in turn raising questions about individuals' preparation for work.[16]

Mr. Witherspoon is determined that if given the opportunity, he will return to be the valuable and productive member of the community he was for many years. This experience has been humiliating, and the public shame and embarrassment that stems from a federal conviction for a man wholly unfamiliar with the criminal justice system has forced painful introspective assessments of his poor judgment and actions. As a convicted felon facing a potential prison sentence, he now stands as a warning and a deterrence to all those family, friends, and peers.

Accordingly, Mr. Witherspoon asks the court to consider the detrimental effects that imprisoning Stanton will have on his wife, children, community, and vary downward from the Sentencing Guidelines.

---

[16] *See* National Research Council, *supra* note 23, at 235.

### E. The Court Should Seek Uniformity In Sentencing And That Similarly Situated Defendants Receive Similar Sentences

18 U.S.C. §3553(a)(6) advises the court to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. In its holding in *Booker* the United States Supreme Court stated:

> [t]his point is critically important. Congress' basic goal in passing the Sentencing Act was to move sentencing in the general direction of uniformity. That uniformity does not simply consist of similar sentences for those convicted of violation the same statute…[i]t consists, more importantly, of similar relationships between sentences and real conduct…

*Booker*, 543 U.S. at 254. The necessity for consistent and not disparate sentencing, especially within the same district, cannot be overstated. Part of the purpose behind creating the Sentencing Commission was to ensure that similarly situated defendants receive comparable sentences.

In *United States v. Johanah Napoleon,* No. 22-601113 CR Smith (S.D.F.L. May 24, 2022), Ms. Napoleon pled guilty to Count 1 of the information in Case No. 22-60111-CR-Smith which charged her with conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. §1349. Additionally, she pled guilty to Count 1 of the information in Case No. 22-60018-CR-Smith, which charged her with wire fraud in violation of 18 U.S.C. §1343. At the time of her sentencing, Ms. Napoleon's guideline range was 41 to 51 months, and her agreed to forfeiture amount was $3,205,414.00. Ms. Napoleon was sentenced to 21 months of imprisonment by this honorable Court.[17] Johana Napoleon was the owner and operator of multiple schools, including Med-Life, Palm Beach School of Nursing, Sunshine Academy, Quisqueya, and Florida College of Health. Ms. Napoleon and her co-defendants directed students to complete certain forms and exclude the dates on the application so that she and her co-conspirators could modify and backdate the dates to make it appear as though

---

[17] *United States v. Johanah Napoleon,* No. 22-601113 CR Smith (S.D.F.L. May 24, 2022), DE#42

15

the student had been part of a previous graduating class. They also created false and fraudulent diplomas and educational transcripts. Mr. Witherspoon **never** modified application dates or created fraudulent diplomas or transcripts.

Similarly, in *United States v. Eunide Sanon,* No. 23-60113 CR Moreno (S.D.F.L. Jan 23, 2023), Ms. Sanon pled guilty to one count of conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. §1349. At the time of her sentencing, Ms. Sanon's guideline range was 41 to 51 months, and her agreed to forfeiture amount was $1,287,633.00. Ms. Sanon was the owner and operator of Sienna College. According to her factual proffer Ms. Sanon and her co-conspirators, Geralda Adrien and Woosvelt Predestin, created and mailed false transcripts and diplomas to state accreditation agencies and assisted co-conspirators to obtain fraudulent nursing licenses from state licensing agencies. In 2018, Ms. Sanon contacted Stanton Witherspoon and requested his assistance in recruiting students for her school Siena College. Ms. Sanon and Mr. Witherspoon agreed to become 50/50 owners of Siena. It is important to note that Mr. Witherspoon was the co-owner in name but he never had any access to the school's bank accounts and did not have any responsibilities for the administration and running of the school. Throughout the period of the conspiracy Ms. Sanon (and her co-conspirators), not Mr. Witherspoon, created the fraudulent diplomas and transcripts.

Furthermore, in *United States v. Geralda Adrien*, Case No. 21-60198-CR-Dimitrouleas (S.D.F.L. July 9, 2021) Ms. Adrien pled guilty to conspiracy to commit healthcare fraud and wire fraud in violation of 18 U.S.C. §1349. During the period of the charged conspiracy Ms. Adrien was the president of PowerfulU and the manager of Docu-Flex. According to her factual proffer she back-dated diplomas and student transcripts, instructed purchasers how to use the documents to obtain state certification to practice as registered nurses and licensed nurse practitioner and completed required online continuing education courses on behalf of the purchasers and transmitted the ensuing certificates of completion to the accreditation agency. At the time of sentencing Ms. Adrien's advisory sentencing guideline imprisonment range was 51 months to 63 months and her restitution amount was $3,309,000. The

government filed a 5K1.1 motion for Ms. Adrien. She was sentenced to 27 months imprisonment.[18] Mr. Witherspoon **never** created false and fraudulent diplomas and educational transcripts, nor did he attend continuing education courses on behalf of students.

In addition, in *United States v. Woosevelt Predestin,* Case No. 21-60198-CR-Dimitrouleas (S.D.F.L. July 9, 2021), Mr. Predestin pled guilty to conspiracy to commit healthcare fraud and wire fraud in violation of 18 U.S.C. §1349 as Ms. Predestin was an employee of Powerful-U and Docu-Flex. Mr. Predestin also backdated diplomas and student transcripts, instructed purchasers how to use the documents to obtain state certification to practice as registered nurses and licensed nurse practitioners, and created fraudulent transcripts. At the time of sentencing, Mr. Predestin's advisory sentencing guideline imprisonment range was 41 months to 51 months, and his restitution amount was $3,309,000. Mr. Predestin was sentenced to 27 months imprisonment. [19] As previously stated, Mr. Witherspoon **never** created false and fraudulent diplomas and educational transcripts nor did he instruct purchasers how to use the documents to obtain state certification.

Mr. Witherspoon and his co-conspirators, Alfred Sellu and Rene Bernadel, recruited students who were seeking nursing credentials for Sienna College. Mr. Witherspoon knew the students were receiving false diplomas and transcripts from Sienna College. However, Mr. Witherspoon did not participate in the creation or distribution of those documents to state licensing boards or potential employers. Mr. Witherspoon's conduct is distinguishable and less egregious than the conduct of the above-referenced defendants. As such, undersigned counsel argues that a lower sentence is more appropriate.

IV. **CONCLUSION**

---

[18] *United States v. Geralda Adrien*, Case No. 21-60198-CR-Dimitrouleas (S.D.F.L. July 9, 2021), DE#88.
[19] *United States v. Woosevelt Predestin*, Case No. 21-60198-CR-Dimitrouleas (S.D.F.L. July 9, 2021), DE#77.

Mr. Witherspoon has readily admitted his mistakes and is truly repentant. He now stands before the court as a convicted felon who will forever have to live with the shame and consequences of his acts. He is disgraced in the community and now faces the weight of being a convicted felon forever.

In this instance, Mr. Witherspoon is asking this court to sentence him below the applicable guidelines. Undersigned counsel will make a specific sentencing recommendation at the time of sentencing.

**WHEREFORE,** based upon the foregoing and additional arguments to be made at the time of sentencing, the Defendant, STANTON WITHERSPOON, by and through his undersigned counsel, moves this Court to grant his motion for downward variance in accordance with 18 U.S.C. §3553 and sentence the Defendant to a sentence below the applicable guidelines.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record this 27th day of October 2023.

Respectfully submitted,

ANNABELLE NAHRA NADLER, ESQ.
Annabelle Nahra Nadler, LLC
One Biscayne Tower
2 S Biscayne Boulevard, Ste 2530
Miami, FL 33131
Telephone: 305-703-5141
E-mail: annabelle@lady-justice.com

By: /s/ *Annabelle Nahra Nadler, Esq.*

Fla. Bar No. 96072